USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 9/26/19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

JORGE ROCHA-GOMEZ,

               Defendant.

---

No. 19-CR-494 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

Defendant Jorge Rocha-Gomez is charged in a three-count indictment with participating in a narcotics conspiracy and possessing and using a firearm. Rocha-Gomez now moves to suppress the evidence seized – including drugs, drug paraphernalia, and a firearm – during a court-authorized search of his apartment on May 31, 2019. He also moves to suppress his post-arrest statements made after the search that evening on the basis that they constitute fruits of the poisonous tree.[1] For the reasons provided below, the motion to suppress is denied, as is his request for an evidentiary hearing.[2]

## BACKGROUND

The following facts are drawn from the Criminal Complaint and the Government's application for a warrant.

On or about May 30, 2019, a confidential source ("CS-1") contacted the New York City Police Department ("NYPD") to report that he had been the victim of an attempted murder and

---

[1] Rocha-Gomez does not dispute that he knowingly waived his *Miranda* rights before making these statements.

[2] Generally, a hearing is provided if there are "contested issues of fact going to the validity of the search in question." *United States v. Watson*, 404 F.3d 163, 167 (2d Cir. 2005). However, a court is "not required as a matter of law to hold an evidentiary hearing if appellant's moving papers did not state sufficient facts which, if proven, would have required the granting of the relief requested." *United States v. Culotta*, 413 F.2d 1343, 1345 (2d Cir. 1969).

kidnapping.[3] Def.'s Mot. Ex. A ¶ 5 n.1 (Aff.). According to CS-1, the assailants attacked him because they believed he was involved in a recent drug-related robbery. *Id.*

At some point soon after calling the NYPD, CS-1 spoke with Homeland Security Investigations ("HSI") agents and shared the following information, which became the basis for the search warrant at issue here. As stated in the Affidavit of Special Agent Range Herring (the "Affidavit"), "[d]uring the last three years, on approximately thirteen separate occasions, CS-1 has delivered cocaine and heroin from an individual known to CS-1 as 'P.J.' who resides in the Subject Premises. CS-1 estimates that, across those approximately thirteen occasions, CS-1 collectively purchased approximately 91-130 kilograms of cocaine and/or heroin. On several occasions while inside the Subject Premises to engage in narcotics transactions, CS-1 has observed P.J. place narcotics in a dresser drawer inside his bedroom." *Id.* ¶ 5(a)(b). The Affidavit further asserted that "[a]s recently as two weeks ago," CS-1 decided to stop working with "P.J." to distribute cocaine and heroin and thus returned substantial quantities of drugs to "P.J." at this same apartment. *Id.* ¶ 5(c).

On May 31, 2019, the Government applied for the search warrant. The application included Special Agent Herring's Affidavit, which relied "on information provided by [CS-1] to HSI agents, surveillance of Building-1 conducted by HSI agents, [Special Agent Herring's] discussions with HSI agents, and [his] training and experience." *Id.* ¶ 5. In the Affidavit, Special Agent Herring asserted that he believed the apartment at 2065 Creston Avenue was "a stash house for narcotics distribution and that C.J. and others are using the Subject

---

[3] CS-1's gender is unclear. For convenience, this Opinion refers to CS-1 as "he," as does Rocha-Gomez.

2

Premises to store narcotics."[4] *Id.* ¶ 6. The Affidavit described the premises to be searched as follows:

> Apartment 4 located inside 2065 Creston Avenue, Bronx, New York ("Building-1"). Building-1 is a beige, multi-story apartment building on Creston Avenue between East Burnside Avenue and 181st Street in the Bronx. The Subject Premises is located on the fourth floor of Building-1, and is accessed through a door containing an identifier of "4" affixed to it. A blue welcome mat is on the floor directly in front of the Subject Premises.

*Id.* ¶ 3. The attachment to the warrant included the same description of the premises as provided in the Affidavit and permitted the seizure of several items, including evidence of narcotics possession or sale, as well as firearms. Def.'s Mot. Ex. E, Attach. A (Warrant). The warrant was signed by Magistrate Judge Cott.

That evening, with the judicially-approved search warrant in hand, the HSI agents executed the search. Compl. ¶ 7(a). Upon entering the premises, the agents encountered Rocha-Gomez. *Id.* ¶ 7(b). In addition to documents identifying the apartment as Rocha-Gomez's residence, the HSI agents also found bagged substances – later determined to be 218 grams of heroin and 257 grams of cocaine – and paraphernalia used for packaging the drugs. *Id.* ¶ 7(d). A handgun was also discovered. *Id.* ¶ 7(f).

## DISCUSSION

Rocha-Gomez moves to suppress the seized evidence and his post-arrest statements on two grounds. First, he argues that the warrant was unsupported by probable cause because it relies entirely on an unidentified informant. *See* Def.'s Mot. at 6-9. Second, he contends that the warrant did not describe the premises to be searched with sufficient particularity. *See* Def.'s Mot. at 10-12. In light of the good-faith exception, neither challenge supports excluding the seized evidence because the HSI agents were objectively reasonable in relying on the court-

---

[4] At one point in the Affidavit, it seems to mistakenly refer to "P.J." as "C.J."

ordered warrant. *See United States v. Leon*, 468 U.S. 897, 922 (1984). Accordingly, the Court denies Rocha-Gomez's motion to suppress.

**I.      Probable Cause**

Rocha-Gomez argues that the Affidavit failed to provide probable cause for the warrant. In particular, he contends that the Affidavit improperly relied entirely on an "unidentified informant" with no established reliability and without "a single fact to independently corroborate the informant's story." Def.'s Mot. at 6-8.

The Fourth Amendment guarantees the right "against unreasonable searches and seizures." U.S. Const. amend. IV. Probable cause exists "where the known facts and circumstances are sufficient to warrant a [person] of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (citations omitted). The inquiry requires evaluating the totality of the circumstances to determine whether there is "the probability, and not a prima facie showing, of criminal activity." *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993) (quoting *Illinois v. Gates*, 462 U.S. 213, 235 (1983)).

A warrant application may, as is the case here, rely on hearsay from an informant to establish probable cause. *See Jones v. United States*, 362 U.S. 257, 269 (1960). The same totality-of-the-circumstances analysis applies, although particularly relevant are the "'informant's veracity, reliability and basis for knowledge,' and the extent to which an informant's statements . . . are independently corroborated." *United States v. Gagnon*, 373 F.3d 230, 235 (2d Cir. 2004) (internal citation omitted). In determining whether an informant is reliable, courts consider certain facts, including how the informant obtained the disclosed information, *see Wagner*, 989 F.2d at 73; whether law enforcement met with the informant in-

4

person, *see United States v. Canfield*, 212 F.3d 713, 719 (2d Cir. 2000); and what the informant's motive was in disclosing the information, *see Gagnon*, 373 F.3d at 236. Yet even if the Affidavit fails to establish the informant's reliability, that deficiency may be overcome by independent police corroboration of the informant's story. *See United States v. Elmore*, 482 F.3d 172, 181 (2d Cir. 2007) (weighing an informant's reliability on "a sliding scale" with independent corroboration). Ultimately, however, a magistrate judge's finding of probable cause is entitled to "substantial deference." *Wagner*, 989 F.2d at 72.

The Affidavit clearly established the basis of CS-1's knowledge in light of his personal observations and involvement in the drug trafficking at issue. The Affidavit states that CS-1 engaged in narcotics transactions inside the premises numerous times over three years, and returned substantial quantities of cocaine and heroin to the premises as recently as two weeks ago. *See* Def.'s Mot. Ex. A ¶ 5(a) (Aff.). These facts are similar to those in *United States v. Canfield*, where the court was "satisfied that [the informant] had a sufficient basis of knowledge" because the informant had seen and overheard conversations about the contraband. 212 F.3d at 719. Rocha-Gomez attempts to cast doubt on CS-1's basis of knowledge because the Affidavit says that CS-1 both "delivered" and "purchased" narcotics from "P.J." *See* Def.'s Mot. at 9. The Court finds this argument unpersuasive. As an initial matter, CS-1 may in fact have distributed narcotics for "P.J." in addition to having purchased narcotics from him for the purpose of re-selling it. But even if this aspect of the Affidavit is arguably contradictory, it does not change CS-1's representations that he was in the apartment and personally observed drugs there as recently as two weeks prior. Thus, CS-1's firsthand knowledge of the probability that contraband was in the identified apartment supports a finding of probable cause.

What is more problematic about this Affidavit, however, is the lack of information establishing CS-1's reliability. *See Wagner*, 989 F.2d at 72-73 ("The core question in assessing probable cause based upon information supplied by an informant is whether the information is reliable."). On one hand, CS-1 acquired this information from personal observation. *See id.* at 73. But "an informant's status as an eyewitness does not alone 'impart an automatic badge of reliability,'" *United States v. Zucco*, 694 F.2d 44, 48 (2d Cir. 1982) (citation omitted), and the Affidavit provides little else to establish CS-1's veracity. Among other things, the Affidavit does not indicate whether CS-1 met with the HSI agents in-person to share this information, or if the information was gathered over the phone. *See United States v. Salazar*, 945 F.2d 47, 50-51 (2d Cir. 1991) ("[A] face-to-face informant must, as a general matter, be thought more reliable than an anonymous telephone tipster, for the former runs the greater risk that he may be held accountable if his information proves false."). It is also not clear from the Affidavit whether CS-1 remained anonymous to the HSI agents or was eventually identified. By identifying CS-1, the HSI agents could have obtained information about CS-1's history that may have spoken to his reliability as a source. For instance, this court has noted that whether an informant has "[p]rior convictions are a relevant consideration in determining probable cause."[5] *See Wagner*, 989 F.2d at 73.

In addition, CS-1's motive in disclosing this information to the HSI agents is not apparent from the Affidavit. The parties dispute whether CS-1 qualifies as a private citizen or criminal informant. *Compare* Gov't.'s Opp. at 7, *with* Def.'s Reply Mot. at 6. Either way, CS-1's possible motives are difficult to assess. On the one hand, an informant's participation in the

---

[5] The Government's opposition states that "the identity of CS-1 was known to law enforcement agents at the time the Herring Affidavit was sworn, and Magistrate Judge Cott easily could have inferred that CS-1 was not anonymous to law enforcement agents based upon the fact that CS-1 both had 'called' the NYPD and provided information separately to HSI." Govt.'s Opp. at 6. This assumption, however, is not clear from the Affidavit.

6

underlying crime – as is the case here – is generally accepted as a sign of trustworthiness. *See United States v. Harris*, 403 U.S. 573, 583 (1971) (explaining, in the context of an informant's tip, that "[a]dmissions of crime . . . carry their own indicia of credibility – sufficient at least to support a finding of probable cause to search"). On the other hand, the Affidavit does not say whether CS-1 stands to gain anything, such as leniency, from speaking with the HSI agents. *See United States v. Steppello*, 664 F.3d 359, 366 (2d Cir. 2011) (explaining that the "motivat[ion] to be truthful to receive leniency . . . suggest[s] reliability").

There is, moreover, virtually no corroboration of CS-1's information mentioned in the Affidavit. Independent corroboration of an informant's information can speak to his or her veracity. *See United States v. Clark*, 638 F.3d 89, 98 (2d Cir. 2011) ("Partial corroboration of an informant is a circumstance that, on totality review, may allow a judicial officer to credit the informant's whole account."). In *Gates v. Illinois*, for instance, the Supreme Court reviewed an affidavit based on an anonymous tip shared via letter, which "provide[d] virtually nothing from which one might conclude that its author is either honest or his information reliable." *See* 462 U.S. at 227. Nonetheless, the Court upheld the probable cause determination because of the extensive corroboration provided by the police. *Id.* at 245-46. Similarly, in *United States v. Wagner*, the informant had "described numerous occasions on which he personally witnessed, and even participated in, drug distribution-related activities" with the target, but it was "[t]he CI's account, as corroborated, [that] established probable cause." 989 F.2d at 73-74; *see also Canfield*, 212 F.3d at 720 (relying on substantial corroboration of narcotics activity to "indicate[] that CI-1 was truthful as to these details").

Here, by contrast, the Affidavit provided minimal corroboration of CS-1's information. Although the Affidavit cited "surveillance of Building-1 conducted by HSI agents" as another

7

basis for probable cause, it did not indicate what information was discovered from the surveillance, precisely where the surveillance was conducted (i.e., inside or outside the building) or with whom. Def.'s Mot. Ex. A. ¶ 5 (Aff.). Nor did Special Agent Herring include any other corroboration, except to say that he had "discussions with [other] HSI agents." *Id.* There was thus virtually no corroboration of CS-1's information. *See Clark*, 638 F.3d at 99 (refusing to find the "conclusory" mention of surveillance as corroborative of an informant's tip).

Although the Affidavit established CS-1's basis of knowledge, it offered little regarding CS-1's reliability or how the HSI agents sought to corroborate his information. It is, therefore, a close question as to whether the Affidavit established probable cause. The Court, however, need not resolve this issue because, as explained below, the fruits of the search are admissible under the good-faith exception.

## II. Particularity

Rocha-Gomez next challenges the adequacy of the warrant's description of the premises to be searched. He first argues that the search was unauthorized because the HSI agents entered an apartment that did not match the warrant's description of the premises. *See* Def.'s Mot. at 11-12. Next, he contends that the warrant's description was insufficiently particular for the HSI agents to reasonably ascertain which apartment to search. *See* Def.'s Mot. at 10-11.

The Fourth Amendment requires that search warrants "particularly describ[e] the place to be searched." U.S. Const. amend IV. This "protects individuals from 'exploratory rummaging' not supported by probable cause." *United States v. Bershchansky*, 788 F.3d 102, 111 (2d Cir. 2015) (citation omitted). The Court "look[s] directly to the text of the search warrant to determine the permissible scope of an authorized search." *Id.* at 111. Thus, the warrant's description of the premises "curtail[s] the officers' discretion when executing the warrant."

8

*United States v. George*, 975 F.2d 72, 76 (2d Cir. 1992). "[A] warrantless search, absent some exception, violates the Fourth Amendment not because the description in the warrant was insufficient or inaccurate, but rather because the agents executing the search exceeded the authority that they had been granted by the magistrate judge." *United States v. Voustianiouk*, 685 F.3d 206, 212 (2d Cir. 2012).

A warrant's description of the premises to be searched is sufficiently particular "if the description is such that the officer with a search warrant can, with reasonable effort ascertain and identify the place intended." *Steele v. United States*, 267 U.S. 498, 503 (1925). By contrast, a search might be impermissible if "the description . . . is so vague that it fails reasonably to alert executing officers to the limits of their search authority." *See Clark*, 638 F.3d at 94. Nonetheless, "inaccuracies or ambiguities in a warrant do not necessarily render a warrant invalid under the Fourth Amendment." *Voustianiouk*, 685 F.3d at 212.

First, Rocha-Gomez argues that the search was unauthorized because the apartment did not have a "4" affixed to the door, and the apartment thus did not match the warrant's description. *See* Def.'s Mot. at 11-12. In his reply, Rocha-Gomez filed an affidavit stating that there was no "4" affixed to the door at the time of the search, or even within the year prior to the search.[6] *See* Def.'s Reply Mot. Ex. A ¶ 4, 5. Rocha-Gomez does not deny that the apartment searched had a "blue welcome mat" outside, as described in the warrant. *See* Def.'s Reply Mot. at 11.

---

[6] Before filing this affidavit, Rocha-Gomez relied on pictures of the fourth-floor apartments taken by a defense investigator on August 19, 2019, two months after the search at issue, to make this argument. *See* Def.'s Mot. at 5 n.5. Only in his reply – filed four days late – did he submit the affidavit clarifying his contention that the photos represented what the premises looked like on the day of the search. *See Maryland v. Garrison*, 480 U.S. 79, 85 (1987) (explaining that courts look to "the information available to [officers] at the time they acted," not "items of evidence that emerge after the warrant is issued").

9

Even accepting Rocha-Gomez's assertion that there was no "4" on the door, the search was likely within the warrant's scope. The two cases that Rocha-Gomez relies on are inapposite as in both, law enforcement officers searched a premise other than the one described in the warrant. *See* Def.'s Reply Mot. at 12-13. In *United States v. Bershchansky*, the warrant permitted a search of "Apartment 2," but the officers entered "Apartment 1." 788 F.3d at 111. Holding this was an unauthorized search, the court explained that "the agents could not have reasonably concluded . . . that they were authorized to search Apartment 1" because the warrant "clearly specified Apartment 2." *Id.* at 112. Similarly, in *United States v. Voustianiouk*, the court concluded that officers conducted an unauthorized search because the warrant "explicitly authorize[d] the search of the first-floor apartment and ma[de] no mention of the second floor apartment" that was instead searched. 685 F.3d at 211. The court distinguished this situation, where "[i]f anything, the warrant was quite clear and specific," from a case where the warrant "inaccurately or incompletely describe[d] the place that the magistrate judge had authorized." *Id.* at 213.

Unlike in *Bershchansky* and *Voustianiouk*, it is not evident that the HSI agents here searched an apartment other than the one "that the magistrate judge who issued the warrant intended to be searched." *Id.* at 211. Rather, in line with the warrant's description, the HSI agents searched an apartment at the specified addressed, on the fourth floor, with a "blue welcome mat" outside. *See* Def.'s Mot. Ex. E, Attach. A (Warrant). That there was no "4" affixed to this door on the fourth floor is more an inaccuracy with the warrant's description, which does not itself render the warrant invalid. *See Voustianiouk*, 685 F.3d at 212. As noted in *Bershchansky*, a warrant with partially incorrect information is still valid so long as there is "other information in the warrant" that "strongly indicate[s] a particular location" is the correct

10

one to search. *Bershchansky*, 788 F.3d at 111. The bright "blue welcome mat" outside the door, which can clearly be seen in the picture provided by Rocha-Gomez, Def.'s Mot. Ex. C, and which Rocha-Gomez does not dispute was present, "was the more salient descriptor of the location to be searched." *Bershchansky*, 788 F.3d at 112.

Although the premises could have been better identified, also making this a close question, the HSI agents were likely reasonable in concluding that the apartment fell within the warrant's authorization. The agents searched an apartment, as described in the warrant, at the address provided, on the fourth floor, with a "blue welcome mat" outside. Rocha-Gomez has not alleged that any of the seven other apartments on the building's fourth floor had a similar blue mat outside, or any blue mat at all. In any event, suppression is inappropriate because, for the reasons discussed in the subsequent section, the good-faith exception applies.

Second, Rocha-Gomez also seems to argue that, even without the alleged inaccuracy regarding the "4" on the door, the warrant's description of the premises was overly broad. *See* Def.'s Mot. at 10-11. He contends that the description of an apartment "on the fourth floor of Building-1, [which] is accessed through a door containing an identifier of '4' affixed to it" with "[a] blue welcome mat" outside is insufficiently particular because "there was 'no reasonable probability' the wrong apartment would be raided." Def.'s Reply Mot. at 9.

Rocha-Gomez's argument relies on the fact that the building had two wings – north and south – with four apartments on each wing's fourth floor. *See* Def.'s Mot. at 10. With a total of eight fourth-floor apartments, the warrant did not specify which side the apartment was on or provide a letter specifying which apartment to search (e.g., "4G"). Therefore, the specific identifiers of which apartment to search on the fourth floor were a "4" affixed to the door and the "blue welcome mat" outside the door. Def.'s Mot. Ex. E, Attach. A (Warrant).

Here, the detail of the "blue welcome mat," in addition to the building's specific address and floor, likely offered enough specificity for the HSI agents to reasonably ascertain which apartment was the one the warrant intended to be searched. Nevertheless, the Court need not definitively resolve whether this description was sufficiently particular because the good-faith exception's application would preclude suppression.

**III.   Good-Faith Exception**

Under the good-faith exception, "evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant" may be exempt from the exclusionary rule. *Leon*, 468 U.S. at 922. This turns on "'whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.'" *Herring v. United States*, 555 U.S. 135, 145 (2009) (quoting *Leon*, 468 U.S. at 922 n.23). Because suppression is a "last resort," "most searches conducted pursuant to a warrant would likely fall within [*Leon*'s] protection." *Clark*, 638 F.3d at 99-100. However, there are four circumstances where the good-faith exception is inapplicable: "(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliability upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable." *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992) (citing *Leon*, 468 U.S. at 923).

None of these circumstances are present here. Neither party alleges that the magistrate judge was misled by information in the Affidavit, and the magistrate judge certainly did not abandon his judicial role in approving this warrant application. *See Clark*, 638 F.3d at 101 ("[A]bandonment of judicial neutrality and detachment properly cannot be inferred from the fact that the magistrate committed legal error in his assessment of probable cause.").

Nor can the Court say that the Affidavit at issue "was *so* lacking in indicia of probable cause as to render reliance upon it unreasonable." *Id.* at 100 (emphasis added). Although the Affidavit could – and frankly, should – have been more detailed, it was not "bare bones, *i.e.*, totally devoid of factual circumstances to support conclusory allegations," as Rocha-Gomez contends. *Id.* at 103; *see* Def.'s Reply Mot. at 8. Rather, it was based on CS-1's personal observations of drug trafficking in the particular apartment searched. Moreover, that a probable cause determination might have been in error is insufficient to render the good-faith exception inapplicable. *See United States v. Falso*, 544 F.3d 110, 128 (2d Cir. 2008) ("Once the district court ruled on the legal sufficiency of the facts alleged in the affidavit, the officers were justified in executing the warrant."); *United States v. Cancelmo*, 64 F.3d 804, 809 (2d Cir. 1995) ("[W]e decline to hold that the agents acted unreasonably in accepting the magistrate's legal conclusion that probable cause existed."). As such, it would be unreasonable to expect the HSI agents to question the magistrate judge's determination before executing the search, particularly when the Affidavit stated facts based on an informant's firsthand knowledge. *See Leon*, 468 U.S. at 921.

Finally, a warrant may be facially deficient for failing to particularize the place to be searched, but to prevent the good-faith exception's application requires that "the warrant is so facially deficient that reliance upon it is unreasonable." *Moore*, 968 F.2d at 222 (citing *Leon*, 468 U.S. at 923). This case does not present that extreme. Here, the description of the apartment provided a building address, and stated that the apartment was on the fourth floor, with a "4" affixed on it, and a "blue welcome mat" outside. Def.'s Mot. Ex. E, Attach. A (Warrant). Based on this description, a reasonably well-trained officer would expect to find the apartment described.

Although Rocha-Gomez has alleged that the warrant inaccurately described the apartment at the time of the search because in actuality it was missing the "4," it was not objectively unreasonable for the HSI agents to search the only apartment on the fourth floor with a "blue welcome mat" in front of it. By contrast, in *Bershchansky*, the court refused to apply the good-faith exception because the officers searched an apartment clearly not encompassed by the warrant's description. *See* 788 F.3d at 113-14 (finding that "the agents' 'significant errors constitute the type of conduct that is sufficiently deliberate'"). The same was true in *Voustianiouk*, where the court determined that "the[] officers knowingly ventured beyond the clear confines of their warrant." 685 F.3d at 215. The facts here, however, do not suggest that the HSI agents intentionally exceeded the warrant's scope. Thus, particularly without allegations that any other apartments had a blue mat outside, the Court cannot say that the HSI agents acted in a "flagrant" manner warranting suppression. *Clark*, 638 F.3d at 104.

In sum, the good-faith exception ordinarily applies when officers "acted pursuant to a warrant." *Leon*, 468 U.S. at 924. This is particularly true, when as here, there is no suggestion that the HSI agents acted in bad faith. *See Herring*, 555 U.S. at 144 ("[T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct."). Even if probable cause was lacking and/or the warrant was insufficiently particular, the good-faith exception applies.

## CONCLUSION

Accordingly, the Court denies Rocha-Gomez's motion to suppress the evidence seized in the search on May 31, 2019 and his statements following his post-search arrest. The Clerk of Court is respectfully directed to close the motion at docket number 12.

Dated: September 26, 2019
New York, New York

Ronnie Abrams
United States District Judge